# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE THE CHEMOURS COMPANY DERIVATIVE LITIGATION | ) ) ) ) ) | CONSOLIDATED C.A. No. 2020-0786-SG |

## MEMORANDUM OPINION

Date Submitted: July 19, 2021
Date Decided: November 1, 2021

Gregory V. Varallo, of BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; OF COUNSEL: Mark Lebovitch and Daniel E. Meyer, of BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; and Robert D. Klausner and Stuart A. Kaufman, of KLAUSNER KAUFMAN JENSEN & LEVINSON, Plantation, Florida, *Attorneys for Plaintiff City of Hialeah Employees' Retirement System.*

Gregory V. Varallo, of BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; OF COUNSEL: Gustavo F. Bruckner and Daryoush Behbood, of POMERANTZ LLP, New York, New York; Kip B. Shuman, of SHUMAN, GLENN & STECKER, San Francisco, California; Rusty E. Glenn, of SHUMAN, GLENN & STECKER, Denver, Colorado; and Brett D. Stecker, of SHUMAN, GLENN & STECKER, Ardmore, Pennsylvania, *Attorneys for Plaintiff Roberto Pinto*.

Joel Friedlander, Jeffrey Gorris, and Christopher Foulds, of FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; OF COUNSEL: Jonathan M. Moses, Ryan A. McLeod, and Justin L. Brooke, of WACHTELL, LIPTON, ROSEN & KATZ, New York, New York, *Attorneys for the Defendants*.

**GLASSCOCK, Vice Chancellor**

Broadly speaking, the Delaware General Corporation Law ("DGCL") is an enabling corporate statute, that allows for self-ordering where defaults are eschewed, and, in conjunction with our common law, allows for the broad discretion of corporate fiduciaries exercising their business judgement on behalf of the company. That said, some provisions of the DCGL are proscriptive. Currently at issue are two such provisions, Sections 160 and 173. Those sections prohibit the corporation from repurchase of stock or issuance of dividends where those distributions would exceed (generally speaking) corporate surplus.[1] This prohibition is, obviously, to protect the entity and, more specifically, its creditors.

Sections 160 and 173 are enforceable under Section 174. That section provides that, in the case where the corporation "wilful[ly] or negligen[tly]" has violated Sections 160 or 173, directors "under whose administration" the violation occurred are "jointly and severally liable" to the corporation, and to its creditors in the event of corporate dissolution or insolvency. As written, the statute appears to be incongruent with the general limitation on liability of directors solely to damages for gross negligence (unless exculpated) or loyalty breaches. Section 174, indeed, appears to impose strict and several liability on any director vicariously for the negligence of another corporate actor as well as for her own negligence, and impose

---

[1] As explained in the analysis section of this Memorandum Opinion, this statement is an over-simplification in aid of clarity.

as damages the full amount paid out even if no actual harm to the corporate interest ultimately manifests itself.[2]

The Plaintiffs, Chemours Company stockholders, seek to impose such liability here. The Chemours Company ("Chemours" or the "Company") was spun off from E. I. DuPont de Nemours and Company ("DuPont") in 2015 (the "Spin-Off"). At that time, DuPont transferred certain environmental liabilities to Chemours, the size of which, per Chemours, were vastly understated by DuPont. In 2019, Chemours sued DuPont, arguing that if the contractual agreement between these entities was interpreted as transferring all such environmental liabilities to Chemours, above DuPont's estimate, the Spin-Off was illegal because Chemours would be rendered insolvent *ab initio*. This Court found that the matter was governed by an arbitration clause, and dismissed; ultimately, the parties settled by agreeing to divide responsibility for the environmental liabilities.

Before and during the pendency of that dispute, Chemours made stock repurchases and issued dividends. The Chemours board of directors (the "Board") justified these expenditures based on corporate surplus using GAAP principles, as explained to them by external advisors and corporate officers. The Plaintiffs contend

---

[2] That is, where, as here, the distributions are not alleged to have redounded "to the detriment of creditors [or] the long-term health of the corporation," the twin evils addressed by the statutes. *See Klang v. Smith's Food & Drug Centers, Inc*, 702 A.2d 150, 154 (Del. 1997) (stating "purpose behind Section 160").

that the expenditures resulted from negligent or willful wrongdoing, exposing the Director Defendants (defined below) to liability. They argue that Chemours's allegations in the *DuPont* litigation demonstrate that the entity was aware that (given the contingent environmental liabilities) it had no surplus; and that to rely on GAAP, which the Plaintiffs contend did not require accounting for such liabilities, was willful wrongdoing, or negligence. There is no question at present that Chemours is solvent; nonetheless, the Plaintiffs seek to proceed derivatively on behalf of the corporation to compel liability on behalf of the Director Defendants in favor of Chemours. With respect to the dividends, at least, the Plaintiffs are in the unusual position of having received what they allege was an improper distribution, while seeking to benefit from the Director Defendants repaying that distribution to the company whose stock they hold.

In order to proceed derivatively, the Plaintiffs must meet the demand requirement of Rule 23.1. The Plaintiffs argue that demand is excused here, solely on the ground that a majority of the directors could not bring their business judgment to bear because each faces a substantial risk of liability.

Upon consideration, I find that the Plaintiffs have failed to plead specific facts that, if true, imply that the Director Defendants face a substantial likelihood of liability. As a consequence, I do not find that the Complaint raises a reasonable doubt that the majority of the Board would be able to bring its business judgment to

3

bear, making demand futile. In assessing what appears to be the stringent liability provision of Section 174, I find that the section must be read in conjunction with the specific provision of Section 172, which provides that directors are "fully protected" from liability—including, I find, liability under Section 174—if they rely in good faith upon corporate records, officers or experts, insulating the Director Defendants from liability here. In any event, I find that the facts pled do not make reliance on GAAP to determine corporate surplus, under the circumstances alleged, sufficient to imply willful or negligent misconduct. Accordingly, demand is not excused, and the matter must be dismissed.

My reasoning is below.

# I. BACKGROUND[3]

*A. The Parties and Relevant Non-Parties*

Lead Plaintiff City of Hialeah Employees' Retirement System ("Hialeah Retirement") is a Chemours common stockholder.[4]

Additional Plaintiff Roberto Pinto is also a Chemours common stockholder.[5]

Nominal Defendant Chemours is a Delaware corporation with principal executive offices in Wilmington, Delaware.[6] Chemours provides industrial and specialty chemicals products to various markets, including plastics and coatings, refrigeration and air conditioning, general industrial, electronics, mining, and oil refining.[7] Chemours is structured into three main segments: Fluoroproducts, Chemical Solutions, and Titanium Technologies.[8] Chemours was spun off from

---

[3] Unless otherwise noted, the facts referenced in this Memorandum Opinion are drawn from the Verified Stockholder Derivative Complaint (referred to herein as the "Complaint") and the documents incorporated therein. *See generally* Verified Stockholder Derivative Compl., *Roberto Pinto v. Mark Vergnano, et al.*, C.A. No. 2021-0152-SG (Dkt. No. 1), [hereinafter the "Complaint"]. I may also consider documents produced by the Defendants in response to the Plaintiffs' 8 *Del. C.* § 220 books and records demand "to ensure that the plaintiff has not misrepresented their contents and that any inference the plaintiff seeks to have drawn is a reasonable one." *Voigt v. Metcalf*, 2020 WL 614999, at *9 (Del. Ch. Feb. 10, 2020). Citations in the form of "Friedlander Decl. —" refer to the Transmittal Declaration Pursuant to 10 *Del. C.* § 3927 of Joel Friedlander in Support of Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss the Verified Stockholder Derivative Complaint, Dkt. No. 26. Citations in the form of "Friedlander Decl., Ex. —" refer to the exhibits attached to the Friedlander Declaration, Dkt. Nos. 26–27.
[4] Verified Stockholder Derivative Compl., Dkt. No. 1 ¶ 27.
[5] Compl. ¶ 31.
[6] *Id.* ¶ 32.
[7] *Id.*
[8] *Id.*

DuPont on approximately July 1, 2015, and as of December 31, 2020, employed approximately 6,500 employees.[9]

Defendant Mark P. Vergnano has been Chemours's President, CEO, and a director since July 2015.[10]

Defendant Richard H. Brown has been the Chairman of Chemours's Board since July 2015.[11] Brown also served as a member of DuPont's board of directors from 2001 to 2015.[12]

Defendant Curtis V. Anastasio has been a Chemours director since July 2015, and a member of the Board's Audit Committee (the "Audit Committee") since March 2016.[13]

Defendant Bradley J. Bell has been a Chemours director since July 2015.[14] Bell is also the Chairman of the Audit Committee, of which he has been a member since March 2016.[15]

Defendant Mary B. Cranston has been a Chemours director since July 2015 and a member of the Audit Committee since March 2016.[16]

---

[9] *Id.*
[10] *Id.* ¶ 33.
[11] *Id.* ¶ 34.
[12] *Id.*
[13] *Id.* ¶ 35.
[14] *Id.* ¶ 36.
[15] *Id.*
[16] *Id.* ¶ 37.

Defendant Curtis J. Crawford has been a Chemours director since July 2015 and a member of the Audit Committee since March 2016.[17] Crawford was also a member of DuPont's board of directors from 1998 to 2015.[18]

Defendant Dawn L. Farrell has been a Chemours director since July 2015.[19]

Defendant Sean D. Keohane has been a Chemours director since May 2018.[20]

Defendant Erin N. Kane has been a Chemours director since June 2019 and a member of the Audit Committee since July 2019.[21]

Defendant Stephen D. Newlin was a Chemours director from July 2015 to May 2018.[22]

Defendant Mark E. Newman has been Chemours's Senior Vice President since November 2014 and its Chief Operating Officer since June 2019.[23] Newman was also Chemours's Chief Financial Officer from November 2014 to June 2019.[24]

Defendants Newman and Vergnano are referred to as the "Officer Defendants." Defendants Vergnano, Brown, Anastasio, Bell, Cranston, Crawford, Farrell, Keohane, Kane, and Newlin are referred to as the "Director Defendants."

---

[17] *Id.* ¶ 38.
[18] *Id.*
[19] *Id.* ¶ 39.
[20] *Id.* ¶ 40.
[21] *Id.* ¶ 41.
[22] *Id.* ¶ 42.
[23] *Id.* ¶ 43.
[24] *Id.*

Non-party DuPont is the former parent of Chemours.[25] DuPont merged with The Dow Chemical Company ("Dow") on August 31, 2017, forming the world's largest chemical conglomerate ("DowDuPont").[26] In April 2019, DowDuPont separated into three companies: Dow, Inc., a producer of commodity chemicals; DuPont de Nemours, Inc., a producer of specialty chemicals; and Corteva, Inc., which is focused on agriculture.[27]

*B. Factual Background*

1. The Environmental Liabilities

The Complaint alleges that DuPont was exposed to massive environmental liabilities, which it then purportedly transferred to Chemours in connection with the Spin-Off. Specifically, DuPont's Performance Chemicals division, which was the division that DuPont spun off to form Chemours, manufactured certain apparently toxic chemical substances, including perfluoroalkyl and polyfluoroalkyl substances ("PFAS") and, in particular, a type of PFAS known as perfluorooctanic acid ("PFOA").[28] PFAS are man-made industrial components used in a variety of household products, including non-stick cookware, water repellants, and coated papers used to package food.[29] They are designed for extreme durability, and

---

[25] *Id.* ¶ 45.
[26] *Id.* ¶ 46.
[27] *Id.*
[28] *Id.* ¶¶ 47–48, 50.
[29] *Id.* ¶ 48.

therefore do not break down in the environment.[30]  PFAS also allegedly "bio-accumulate" in the blood streams of people and animals that are exposed to contaminated water or air.[31]  Bio-accumulation of PFAS, in turn, purportedly contributes to or causes adverse health effects, including fatal cancers.[32]

As the public became aware of the risks associated with PFAS, DuPont faced nation-wide litigation concerning the discharge of PFAS into the environment by its Performance Chemical division.[33]  Much of this litigation remained unresolved at the time of the Spin-Off.[34]

### 2. The Chemours Spin-Off

Beginning in 2013, DuPont commenced a plan, dubbed "Project Beta," that culminated in the spin-off of DuPont's Performance Chemicals division as an independent, publicly traded company, Chemours.[35]  DuPont announced the Spin-Off in October 2013, and it also determined that the "spinco" (i.e., Chemours) would pay a dividend of $3.3 billion to DuPont, funded with billions of dollars in debt.[36]

As Project Beta progressed, certain members of incoming Chemours management expressed concerns about the health of Chemours's capital structure

---

[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.* ¶ 53; *see also id.* ¶¶ 54–55.
[34] *See, e.g., id.* ¶ 75.
[35] *Id.* ¶ 58.
[36] *Id.* ¶ 61.

following the Spin-Off.[37]   For example, in June 2015, Defendant Newman, Chemours's then-CFO, requested an addition $200-300 million in cash reserves for Chemours, which DuPont rejected.[38]  Chemours also expressed concerns about the potential effects of a $100 million Chemours dividend that DuPont, as Chemours's then-parent and controller, declared for the last quarter prior to the Spin-Off.[39]

As a condition to the Spin-Off, DuPont's board of directors commissioned Houlihan Lokey to opine on the solvency of DuPont and Chemours after the Spin-Off.[40]  Houlihan Lokey's analysis included a quantification of the environmental liabilities that DuPont was transferring to Chemours in connection with the Spin-Off.[41]  To quantify the environmental liabilities, Houlihan Lokey used numbers supplied by DuPont, labeled the "High End (Maximum) Realistic Exposure" for each of the liabilities (the "Maximums").[42]

The Complaint alleges that the Maximums understated the environmental liabilities because they were calculated from figures used to prepare DuPont's account reserves, which only included liabilities that were both probable and reasonably estimable.[43]  Thus, according to the Complaint, the Maximums excluded

---

[37] Id. ¶¶ 64–65.
[38] Id. ¶ 65.
[39] Id.
[40] Id. ¶ 67.
[41] Id. ¶ 68.
[42] Id.
[43] Id. ¶¶ 69–70.

any environmental liabilities that were viewed as merely "possible," as opposed to "probable," as of December 31, 2014, even if they were reasonably estimable, as well as any environmental liabilities that were probable but not yet reasonably estimable at that time.[44] In May 2015, DuPont approached Defendant Newman to certify the Maximums for 87 categories of liabilities being transferred to Chemours.[45] Defendant Newman declined to do so, and instead signed a revised certification stating that he was relying on DuPont as to the accuracy of the Maximums.[46]

On June 5, 2015, DuPont announced that its board of directors approved the Spin-Off, which took effect on July 1, 2015.[47] In connection with the Spin-Off, Chemours assumed various liabilities, including 67% of DuPont's environmental liabilities covering 80 sites and $4 billion in debt used to fund a $3.91 billion dividend back to DuPont.[48]

Under the separation agreement between DuPont and Chemours that governed the Spin-Off (the "Separation Agreement"), Chemours was required to defend and indemnify DuPont against any liability "relating to, arising out of, by reason of or otherwise in connection with" the liabilities assigned by DuPont to Chemours,

---

[44] *Id.* ¶ 70.
[45] *Id.* ¶ 72.
[46] *Id.*
[47] *Id.* ¶ 73.
[48] *Id.* ¶ 74–75.

without limitation.[49]  The Separation Agreement also prohibited Chemours from seeking recourse from DuPont concerning those liabilities.[50]  Following the Spin-Off, in December 2015, the Board approved individual indemnification agreements for the Chemours directors.[51]

### 3. Chemours Undertakes the Five-Point Transformation Plan

According to the Complaint, Chemours struggled in the immediate aftermath of the Spin-Off.[52]  For example, the Company laid off 1,000 employees, closed plants, sold certain business lines, and undertook two corporate restructurings.[53]  The Company's stock price fell from $21.00 per share to $11.40 per share within a month of the Spin-Off, and by January 25, 2016, the share price had fallen further to $3.06 per share.[54]

As a result, the Company took steps to improve its capital structure pursuant to a plan called the "Five-Point Transformation Plan," the purpose of which was to get "the company de-levered as quickly as possible."[55]  For instance, in November 2015, Chemours announced that it would sell a facility in Beaumont, Texas to Dow for $140 million in cash.[56]  In addition, in February 2016, Chemours obtained a $190

---

[49] *Id.* ¶ 77.
[50] *Id.*
[51] *Id.* ¶ 80.
[52] *See id.* § III.C.1.
[53] *Id.* ¶ 81.
[54] *Id.* ¶¶ 81, 83.
[55] *Id.* ¶ 84.
[56] *Id.* ¶ 82.

million advance from DuPont for goods and services to be provided to DuPont through mid-2017.[57] The Company also reduced its quarterly dividends from $0.55 per share to $0.03 per share in September 2015.[58]

### 4. The Environmental Liabilities Continue

Although the Company had taken steps to address its capital structure issues, the environmental liabilities related to PFAS continued to loom. In particular, the Company faced litigation in Ohio, New Jersey, and North Carolina related to PFOA and other types of PFAS.[59]

### a. The Ohio Litigation

In connection with the Spin-Off, Chemours agreed to indemnify DuPont under the Separation Agreement for a multidistrict action in the U.S. District Court for the Southern District of Ohio against DuPont involving approximately 3,550 individuals who had been diagnosed with diseases associated with PFOA exposure (the "Ohio MDL").[60] DuPont certified that the Maximum for the Ohio MDL was $128 million, including defense costs.[61] In mid-2016, however, DuPont lost the first three bellwether cases in the Ohio MDL, incurring an aggregate of $19.7 million in

---

[57] *Id.* ¶ 83.
[58] *Id.* ¶ 241. As the Defendants note, the $0.55 quarterly dividend was declared by Chemours' pre-Spin-Off board, when Chemours was a wholly-owned subsidiary of DuPont. *See* Friedlander Decl., Ex. 15 at 35 n.1, 37 n.4.
[59] *See* Compl. ¶¶ 93–99, 104–18.
[60] *Id.* ¶ 55.
[61] *Id.* ¶ 93.

damages.[62]  And despite estimating that it would win 68% of the PFOA trials, DuPont would go on to lose every single trial.[63]

As a result, Chemours notified DuPont that its indemnification obligation under the Separation Agreement with respect to the Ohio MDL was capped at the $128 million Maximum that DuPont had certified in connection with the Spin-Off.[64] In response, in July 2016, DuPont argued that this $128 million Maximum "represented only estimates based on the best judgment of management and its advisors given available information at the time," and therefore, it had no legal effect on Chemours's indemnification obligations.[65]  DuPont further argued that, instead, Chemours was "contractually obligated to indemnify DuPont for any and all Indemnifiable losses . . .including without limitation any and all judgments."[66]  In February 2017, the parties agreed to settle the Ohio MDL cases for $670.7 million, split evenly between DuPont and Chemours, and with DuPont contributing up to an additional $125 million toward PFOA-related costs, including litigation defense.[67] While the Ohio MDL settlement resolved 3,550 cases, it left unresolved other claims related to PFOA exposure.[68]

---

[62] *Id.* ¶ 95.
[63] *Id.*
[64] *Id.* ¶ 96.
[65] *Id.* ¶ 97.
[66] *Id.*
[67] *Id.* ¶ 98.
[68] *Id.* ¶¶ 117–18.

## b. The New Jersey Litigation

On December 12, 2016, a New Jersey municipality sued DuPont and Chemours for over $1.1 billion for remediation costs of the Chambers Works site.[69] At the time of the Spin-Off, DuPont certified a Maximum for all New Jersey litigation of $337 million.[70] Chemours also inherited three other New Jersey sites from DuPont that become the subject of litigation.[71]

## c. The North Carolina Litigation

Beginning in September 2017, several plaintiffs, including the State of North Carolina, certain public water authorities, well owners, and a consolidated putative class of North Carolina residents filed suit against Chemours and DuPont relating to the Fayetteville Works site, which had been discharging a type of PFAS known as "GenX."[72] At the time of the Spin-Off, DuPont certified a Maximum for liability relating to Fayetteville Works of $2.09 million.[73]

## 5. The Stock Repurchases and Dividends

In 2017 and 2018, the Chemours Board approved two stock repurchase programs and increased the Company's quarterly dividend twice. During this time,

---

[69] *Id.* ¶ 104.
[70] *Id.* ¶ 108.
[71] *Id.* ¶¶ 108–09.
[72] *Id.* ¶¶ 110, 112.
[73] *Id.* ¶ 111.

the Board also regularly discussed and received updates regarding the environmental liabilities.

### a. The 2017 Stock Repurchase Program and Dividend Increases

In January 2017, shortly before Chemours settled the Ohio MDL in February 2017, the Board received a financial update that discussed potential return of capital strategies.[74] The financial update observed that "Chemours' current dividend yield is toward the low end of the range of public chemical companies."[75] The same financial update cautioned that any return of capital strategies "should be evaluated in light of liquidity and credit agreement constraints from any potential settlement of contingent liabilities . . . ."[76] The update added that "[w]hile investors would likely applaud a share repurchase to offset dilution, management believes focus on contingent liabilities . . . should take priority."[77] In April 2017, Defendant Vergnano wrote to the Board that returning capital "would reflect our confidence in the potential to drive Chemours stock price well above current levels."[78]

In the months leading up to the approval of the 2017 Stock Repurchase Program and the increase in dividends, the Audit Committee and the Board discussed the environmental liabilities on several occasions. On January 3, 2017,

---

[74] *Id.* ¶ 129.
[75] *Id.*
[76] *Id.*
[77] *Id.*
[78] *Id.* ¶ 130.

for instance, the Board received a presentation summarizing directors' responses to a questionnaire.[79] In response to a question canvassing the topics the directors would like to cover during the next year, one director wrote, "[w]e . . . need to assess more carefully other potential environmental liabilities that could occur in the normal course of business going forward once the PFOA case is behind us."[80] Likewise, on April 20, 2017, and again on August 1, 2017, the Audit Committee met, along with Defendants Brown, Vergnano and Newman, and discussed litigation related to the environmental liabilities, including legal and environmental reserves and environmental remediation developments.[81]

On August 2, 2017, the Board met and received two presentations concerning a potential share repurchase program and a potential increase in the Company's dividends.[82] The presentations, which were delivered by financial advisors Barclays and Dyal Partners, recommended that Chemours increase its dividends or repurchase stock, noting that Chemours trailed its peers with respect to the return of capital to stockholders.[83] These presentations also emphasized that an increase in the return of capital would be a positive signal to the market.[84] At this meeting, the Board also received a presentation concerning litigation developments regarding the

---

[79] Id. ¶ 120.
[80] Id.
[81] Id. ¶ 132, 138.
[82] Id. ¶ 141.
[83] Id.
[84] Id.

Fayetteville Works site in North Carolina.[85] On October 30, 2017, the Audit Committee met again, with Defendants Brown, Vergnano and Newman in attendance, received further updates regarding environmental litigation, and discussed Chemours's legal and environmental reserves.[86]

A month later, on November 30, 2017, the Board met, with Defendant Newman also in attendance, and approved a share repurchase program authorizing the purchase of up to $500 million (the "2017 Stock Repurchase Program").[87] At the same meeting, the Board also declared a first quarter 2018 dividend of $0.17 per share, a $0.14 increase from the previous $0.03 quarterly dividends.[88] The resolutions approving the 2017 Stock Repurchase Program and the dividend increase stated that the Board believed that the returns of capital complied with the DGCL.[89] The Complaint alleges that, in making this determination, the Board only considered GAAP-based "legal and environmental reserves."[90]

In early 2018, the Board continued to receive presentations and updates regarding the environmental litigation, as well as the Company's legal and environmental reserves. In January 2018, in response to a question about topics or agenda items that should be covered during the year, one director wrote, "I would

---

[85] *Id.* ¶ 140.
[86] *Id.* ¶ 144.
[87] *Id.* ¶ 145.
[88] *Id.*
[89] *Id.*
[90] *Id.* ¶¶ 146–47.

18

personally benefit from . . . a detailed sustainability strategy that reduces the cost of future litigation."[91] Likewise, the Audit Committee met on February 12, 2018, with Defendants Brown, Vergnano and Newman in attendance, and received a litigation report that included a discussion of the environmental litigation.[92] The Complaint alleges that the Audit Committee also discussed the Company's share repurchases, as well as the Company's legal and environmental reserves, but it asserts that the Audit Committee did not discuss these topics "in conjunction" with one another.[93]

The following day, on February 13, 2018, the Board met, with Defendant Newman in attendance, and was informed of the litigation update that the Audit Committee had received the previous day.[94] The Board also received an update on litigation regarding the Fayetteville Works site,[95] and a further update regarding Fayetteville Works litigation at an April 30, 2018 Board meeting.[96]

In May 2018, the Company executed its final purchase of the 2017 Stock Repurchase Program, exhausting the $500 million limit, and the Board declared another $0.17 per share quarterly cash dividend.[97] The resolutions that approved the dividend stated that the Board believed the dividend complied with the DGCL.[98]

---

[91] *Id.* ¶ 151.
[92] *Id.* ¶ 153.
[93] *Id.* ¶ 154.
[94] *Id.* ¶ 156.
[95] *Id.*
[96] *Id.* ¶ 160.
[97] *Id.* ¶¶ 161, 163.
[98] *Id.* ¶ 162.

Again, the Complaint alleges that in forming this belief, the Board relied only on Chemours' accounting-based reserves for the contingent environmental liabilities, calculated in accordance with GAAP.[99]  In particular, the Complaint alleges that on May 1 and 2, 2018, the Audit Committee and the Board, along with Defendant Newman, received updates regarding the environmental litigation and the Company's environmental and litigation reserves.[100]

### b. The 2018 Stock Repurchase Program and Dividend Increases

After the Company exhausted the $500 million 2017 Stock Repurchase Program, the Chemours Board approved a second repurchase program in August 2018 (the "2018 Stock Repurchase Program").  Specifically, on July 30, 2018, the Board met, along with Defendant Newman, and received a report concerning the environmental litigation.[101]  The Complaint alleges that at this meeting, the Board was informed that the Company was facing increased legal and environmental costs.[102]

The following day, on July 31, 2018, the Audit Committee met, with Defendants Vergnano and Newman in attendance.[103]  At this meeting, the Audit

---

[99] *Id.* ¶¶ 162, 165.
[100] *Id.* ¶¶ 164–66.
[101] *Id.* ¶ 167.
[102] *Id.*
[103] *Id.* ¶ 168.

Committee received a litigation report that discussed the environmental litigation.[104] The Board also discussed the Company's environmental and litigation reserves and the Company's share repurchases.[105] Again, however, the Complaint alleges that there is no indication that the share repurchases were discussed "in conjunction" with the environmental and litigation reserves.[106]

A day later, on August 1, 2018, the Board approved the 2018 Stock Repurchase Program, which authorized the repurchase of up to $750 million in shares.[107] The next day, on August 2, 2018, the Board increased the quarterly cash dividend from $0.17 per share to $0.25 per share.[108] The resolutions approving the 2018 Stock Repurchase Program and the dividend increase stated that the Board believed the returns of capital complied with the DGCL, though the Complaint asserts that the Board relied only on accounting-based reserves to form this belief.[109]

In October 2018, the Board declared another $0.25 quarterly dividend.[110] Specifically, on October 29, 2018, the Audit Committee met, with Defendants Brown, Vergnano and Newman in attendance.[111] The Audit Committee discussed the share repurchases at this meeting; received updates on the environmental

---

[104] *Id.* ¶ 168–69.
[105] *Id.*
[106] *Id.* ¶ 169.
[107] *Id.* ¶ 170.
[108] *Id.* ¶ 171.
[109] *Id.*
[110] *Id.* ¶ 174–79.
[111] *Id.* ¶ 174.

litigation, including "significant judgments"; and discussed the environmental and litigation reserves.[112]  The Complaint asserts, again, that there is no indication that the share repurchases were discussed "in conjunction" with the environmental and litigation reserves.[113]

The following day, on October 30, 2018, the full Chemours Board met and approved the $0.25 dividend.[114]  At this meeting, the Board also discussed the environmental litigation, and received an "Enterprise Risk Management" presentation stating that "Legacy/Future Environmental-Operational Sustainability" was the number one risk.[115]  Yet again, the resolutions approving the dividend stated that the Board believed the dividend complied with the DGCL, though the Complaint asserts that this belief was based only on accounting-based reserves.[116] On November 20, 2018, the Board met telephonically, with Defendant Newman present, and received an update on the Fayetteville Works site.[117]

### c. The Board Increases the 2018 Stock Repurchase Program and Declares More Dividends

In early 2019, the Board authorized an increase in the 2018 Stock Repurchase Program.  Specifically, on February 12, 2019, the Audit Committee met, with

---

[112] *Id.* ¶ 174–75.
[113] *Id.* ¶ 175.
[114] *Id.* ¶¶ 176–78.
[115] *Id.* ¶ 177.
[116] *Id.* ¶ 178.
[117] *Id.* ¶ 180.

Defendants Brown, Vergnano and Newman in attendance.[118] At this meeting, the Company received a litigation update, discussed "reserve accounting for [the] Fayetteville" site, and discussed the Company's share repurchases.[119] As with prior meetings, the Complaint asserts that there is no indication that the share repurchases were discussed "in conjunction" with the environmental and litigation reserves.[120]

The following day, on February 13, 2019, the Board met and increased the 2018 Stock Repurchase Program to permit the repurchase of up to $1 billion of the Company's shares.[121] The Board also announced a $0.25 per share quarterly cash dividend.[122] At the meeting, with Defendant Newman present, the Board received an update on a consent order related to the Fayetteville Works site.[123] The Complaint alleges that the Board discussed "what appears to be a GAAP-based accrual for Fayetteville," and that the Board "separately" discussed share repurchases and received a presentation conveying that "INVESTORS WANT CAPITAL ALLOCATED TO THEMSELVES."[124] The Complaint alleges that there is no indication that the share purchases and the environmental and litigation reserves were discussed "in conjunction" with one another at this meeting.[125] The resolutions

---

[118] *Id.* ¶ 187.
[119] *Id.*
[120] *Id.*
[121] *Id.* ¶ 190.
[122] *Id.*
[123] *Id.* ¶ 188.
[124] *Id.* ¶ 189 (capitalization in original).
[125] *Id.*

that approved the share repurchase increase and the dividends stated that the Board believed the return of capital complied with the DGCL, though the Complaint asserts that this belief was based solely on accounting-based reserves.[126]

Two months later, in April 2019, the Board announced a $0.25 quarterly cash dividend. Specifically, on April 29, 2019, the Audit Committee met, along with Defendants Brown, Vergnano and Newman, and received a litigation update that discussed the environmental litigation.[127] The following day, on April 30, 2019, the Board met, with Defendant Newman and the law firm Wachtell, Lipton, Rosen & Katz ("Wachtell") in attendance.[128] At the meeting, the Board participated in a "Litigation Discussion" and announced the $0.25 dividend.[129]

The resolutions approving the dividend stated that the Board believed the dividend complied with the DGCL.[130] However, the Complaint asserts that the Board relied solely on accounting-based reserves in forming this belief, and that there is no indication that the Board quantified or considered the contingent environmental liabilities "in connection" with the stock repurchases.[131] The following day, May 1, 2019, the Board met, along with Wachtell and Defendant

---

[126] *Id.* ¶ 191.
[127] *Id.* ¶ 201.
[128] *Id.* ¶ 202.
[129] *Id.* ¶¶ 202–03.
[130] *Id.* ¶ 203.
[131] *Id.*

Newman.[132]    At the meeting, the Board participated in another "litigation discussion," with Defendant Brown noting "the sensitive nature of the items to be discussed for the day."[133]

In total, Chemours expended approximately $1.07 billion in connection with the 2017 and 2018 Stock Repurchase Programs and approximately $667 million in connection with the dividend payments from July 2015 through February 10, 2021.[134]

### 6. The *DuPont* Complaint

In May 2019, as the environmental liabilities continued to mount, Chemours filed a complaint against DuPont in this Court seeking to hold DuPont liable for any amounts above the Maximums that DuPont certified in connection with the Spin-Off (the "*DuPont* Complaint").[135]

Just before the Company filed the *DuPont* Complaint, on May 6, 2019, Larry Robbins, a hedge fund CEO, gave a presentation at the Sohn Investment Conference in which he discussed liabilities faced by PFAS manufacturers.[136]   Robbins estimated that Chemours's environmental liabilities were around "$4 to 6 billion," and he added that "[t]he liabilities are now Chemours's.  Every time you see DuPont

---

[132] *Id.* ¶ 204.
[133] *Id.*
[134] *Id.* ¶¶ 226, 230, 241.
[135] *Id.* § III.D.
[136] *Id.* ¶ 211.

losing a suit, you should assume that that liability will stay with Chemours."[137] Although the Company publicly disputed Robbins's statements,[138] the day after Robbins's presentation, on May 7, 2019, Chemours stopped the 2018 Stock Repurchase Program.[139]

A week later, on May 13, 2019, Chemours filed the *DuPont* Complaint, which was verified by Defendant Newman.[140] The *DuPont* Complaint sought "to hold DuPont accountable for [the Maximums]," which it alleged "have proven to be systematically and spectacularly wrong."[141] It further alleged that "*if* Chemours had unlimited responsibility for the true potential maximum liabilities, it *would have been* insolvent as of the time of the spin-off."[142] Thus, the *DuPont* Complaint sought a holding that DuPont, and not Chemours, was responsible for any amounts that exceeded the Maximums.[143] The *DuPont* Complaint also sought, in the alternative, the return of the $3.91 billion dividend that Chemours paid to DuPont prior to the Spin-Off.[144]

---

[137] *Id.* ¶ 212–13.
[138] *Id.* ¶ 214.
[139] *Id.* ¶ 215.
[140] *Id.* ¶ 216.
[141] *Id.* ¶ 217.
[142] *Id.* ¶ 219 (emphasis added).
[143] Verified First Amended Compl. ¶¶ 120–79, *The Chemours Company v. DowDuPont Inc.*, C.A. No. 2019-0351-SG (Dkt. No. 33) [hereinafter the "*DuPont* Complaint"].
[144] *Id.* ¶¶ 180–201.

The instant Complaint alleges that in the *DuPont* Complaint, Chemours "admitted" to $2.56 billion in liabilities that it inherited from DuPont at the time of the Spin-Off. Specifically, the Complaint alleges that the *DuPont* Complaint admitted to $335 million in liability for the Ohio MDL, $1.7 billion in liability for New Jersey litigation, $200 million in liability for the Fayetteville Works site, $111 million in liability for benzene, and $194 in liability for PFAS, including GenX.[145] The Complaint alleges that these figures, taken from the *DuPont* Complaint, were Chemours's "conservative estimates."[146]

On December 18, 2019, at oral argument regarding DuPont's motion to dismiss, Chemours's counsel reiterated the assertion in the *DuPont* Complaint that Chemours would have been insolvent at the time of the Spin-Off if it were liable above the Maximums:

> [CHEMOURS'S COUNSEL]: The Complaint alleges very specifically that as of the date of the spin, Chemours was insolvent. I think [DuPont's counsel] this morning said that that is not the case. Paragraph 125 of the complaint alleges that point in no uncertain terms and very directly. But quite apart from that allegation, the whole theory of the complaint supports the inference and we think compels the inference that the disequilibrium at the time of the spin created the specter of insolvency.[147]

---

[145] Compl. ¶ 222.

[146] *Id.* ¶ 223.

[147] Oral Argument re Plaintiff's Motion to Stay Arbitration and Cross-Motions to Compel Production, Defendants' Motion to Stay Discovery and Motion to Dismiss, and the Court's Partial Ruling, at 72:16–73:1, *The Chemours Company v. DowDuPont Inc.*, C.A. No. 2019-0351-SG (Dkt. No. 56) [hereinafter "*DuPont* Oral Argument Tr."].

27

* * *

[CHEMOURS'S COUNSEL]: . . . . [The case] rests on the allegation that Chemours was insolvent at the time of the spin, provided that DuPont's present interpretation of the complete inutility of its estimated maximum liabilities is credited. The Court was quite right in terms of understanding what our position had been in the complaint in terms of the cushion, in your colloquy with [DuPont's counsel].

THE COURT: That was my understanding, is that you were saying that setting aside the excess over the estimation of the environmental liabilities, there was no cushion. Is that what you were --

[CHEMOURS'S COUNSEL]: That was our position, Your Honor. You have that straight on. And we have alleged that the liability maximums were undertaken to satisfy Delaware law; that they were undertaken in a way that can only lead to an inference of bad faith, because they were just manifestly evidently designed to undercount the liability hugely; and that they did, in fact, undercount the liability hugely, as has been demonstrated; and that, in consequence, the company was not solvent at the time it was spun.[148]

According to the Complaint, Chemours "admitted" in the *DuPont* Complaint that, because of the environmental liabilities, Chemours had been insolvent since the time of the Spin-Off and therefore lacked adequate "surplus" to declare dividends or repurchase stock.[149] The Complaint alleges that the Company also lacked net profits from which to declare dividends.[150]

---

[148] *Id.* at 149:3–150:1.
[149] Compl. § III.D.
[150] *Id.* ¶ 243.

28

The following table demonstrates the Company's total dividends and net profits from 2014 through 2020[151]:

| Year | Net Profits | Total Dividends |
|---|---|---|
| 2014 (prior to Spin-Off) | $400,000,000 | $ - |
| 2015 | $(90,000,000) | $110,402,605 |
| 2016 | $7,000,000 | $16,345,494 |
| 2017 | $746,000,000 | $53,156,517 |
| 2018 | $995,000,000 | $117,227,494 |
| 2019 | $(52,000,000) | $164,495,927 |
| 2020 | $219,000,000 | $164,234,768 |

This Court dismissed the *DuPont* Complaint in light of an arbitration provision in the Separation Agreement that referred all disputes regarding the agreement to binding arbitration.[152] After submitting the dispute to arbitration, DuPont and Chemours agreed to settle their dispute concerning the environmental liabilities on January 22, 2021.[153] The settlement established a cost-sharing agreement for potential future exposure related to PFAS liability, including an escrow account worth almost $1 billion, and resolved approximately 95 cases, along

---

[151] *Id.*
[152] *Chemours Co. v. DowDuPont Inc.*, 2020 WL 1527783, at *1 (Del. Ch. Mar. 30, 2020), *aff'd*, 243 A.3d 441 (Del. 2020).
[153] Compl. ¶ 253.

with unfiled matters.[154]  Under the settlement, expenses are split 50-50 between DuPont and Corteva, on the one hand, and Chemours on the other.[155]  The settlement provides that this 50-50 split will be for a term not to exceed 20 years or $4 billion of qualified spending and escrow contributions, in the aggregate.[156]  In addition, DuPont, Corteva, and Chemours agreed to settle ongoing matters related to the Ohio MDL for $83 million, with DuPont and Corteva paying $27 million each, and Chemours paying $29 million.[157]

### 7. The Stock Trades

In addition to the stock repurchases and dividend payments, the Complaint also challenges certain stock sales by Defendants Vergnano and Newman. Specifically, the Complaint alleges that Defendant Vergnano sold 200,151 shares of Chemours stock for proceeds of over $10 million, and that Defendant Newman sold 155,047 shares of Chemours stock for proceeds of over $6.8 million.[158]  The Complaint alleges that Defendants Vergnano and Newman undertook these sales while aware that Chemours was "insolvent" or "teetering on insolvency" and that the public was "not aware of the true extent of the Company's environmental liabilities."[159]

---

[154] *Id.* ¶ 253.
[155] *Id.*
[156] *Id.*
[157] *Id.* ¶ 254.
[158] *Id.* ¶¶ 249–50.
[159] *Id.* ¶ 248.

*C. Procedural History*

Plaintiff Hialeah Retirement initiated this action on September 16, 2020.[160] On December 17, 2020, I ordered a temporary stay of this action pending a supplemental document production by the Defendants.[161] On February 22, 2021, after a review of the supplemental production, Plaintiff Roberto Pinto filed a Verified Stockholder Derivative Complaint in the action captioned *Pinto v. Vergnano, et al.*, C.A. No. 2021-0152-SG.[162] On February 23, 2021, I (i) ordered the consolidation of the two actions because they presented common issues of law and fact, (ii) appointed Hialeah Retirement as lead plaintiff and Pinto as an additional plaintiff, (iii) appointed Bernstein Litowitz Berger & Grossmann LLP as lead counsel, and (iv) deemed the *Pinto* Complaint the operative complaint.[163]

The Complaint brings derivative claims against the Director Defendants for violations of 8 *Del. C.* §§ 160 and 174 in connection with the 2017 and 2018 Stock Repurchase Programs (Count I); violations of 8 *Del. C.* §§ 170, 173, and 174 in connection with the dividend payments (Count II); and breaches of fiduciary duty in connection with the stock repurchases and dividend payments (Count III).[164] The Complaint also brings claims against the Officer Defendants for breach of fiduciary

---

[160] Verified Stockholder Derivative Compl., Dkt. No. 1.
[161] Order Temporarily Staying Action Pending Suppl. Produc., Dkt. No. 22.
[162] *See generally* Compl.
[163] Order Consolidation, Appointment Lead Pl. Lead Counsel, Setting Briefing Schedule, Dkt. No. 25 ¶¶ 1, 5–7, 9.
[164] Compl. ¶¶ 263–76.

duty (Count IV) and unjust enrichment (Count V) in connection with their stock sales.[165]  Finally, the Complaint brings claims in the alternative against Defendant Vergnano (Count VI) and Defendant Newman (Count VII) for breaches of the duty of candor to the other Director Defendants in connection with the stock repurchases and dividend payments.[166]

The Defendants moved to dismiss the Complaint (the "Motion to Dismiss")[167] and filed an opening brief in support of their Motion to Dismiss on April 23, 2021.[168] The Plaintiffs filed an answering brief in opposition to the Motion to Dismiss on May 24, 2021,[169] and the Defendants filed a reply brief in further support of the Motion to Dismiss on June 23, 2021.[170]  On July 19, 2021, I heard oral argument on the Motion to Dismiss, and I considered the Motion to Dismiss submitted for decision as of that date.

## II. LEGAL STANDARDS

"'A cardinal precept' of Delaware law is 'that directors, rather than shareholders, manage the business and affairs of the corporation.'"[171]  "The board's

---

[165] *Id.* ¶¶ 277–86.
[166] *Id.* ¶¶ 287–300.
[167] Defs.' Mot. Dismiss, Dkt. No. 26.
[168] Defs.' Mem. Law Supp. Defs.' Mot. Dismiss Verified Stockholder Derivative Compl., Dkt. No. 26 [hereinafter "Defs.' Opening Br."].
[169] Pls.' Answering Br. Opp. Defs.' Mot. Dismiss, Dkt. No. 50 [hereinafter "Pls.' Answering Br."].
[170] Defs.' Reply Mem. Law Further Supp. Defs.' Mot. Dismiss Verified Stockholder Derivative Compl., Dkt. No. 54 [hereinafter "Defs.' Reply Br."].
[171] *United Food and Commercial Workers Union and Participating Food Indus. Emp'rs Tri-State Pension Fund v. Mark Zuckerberg et al.*, 2021 WL 4344361, at *6 (Del. Sept. 23, 2021) (quoting

authority to govern corporate affairs extends to decisions about what remedial actions a corporation should take after being harmed, including whether the corporation should file a lawsuit against its directors, its officers, its controller, or an outsider."[172] In other words, a chose in action is a corporate asset like any other, under our model subject to the control of the board of directors. "'In a derivative suit, a stockholder seeks to displace the board's [decision-making] authority over a litigation asset and assert the corporation's claim.'"[173] "Thus, '[b]y its very nature[,] the derivative action' encroaches 'on the managerial freedom of directors' by seeking to deprive the board of control over a corporation's litigation asset."[174] The rationale for permitting derivative litigation to proceed is that the directors are disabled from monetizing the asset, and that the litigation must proceed derivatively or not at all.

"'In order for a stockholder to divest the directors of their authority to control the litigation asset and bring a derivative action on behalf of the corporation, the stockholder must' (1) make a demand on the company's board of directors or (2) show that demand would be futile."[175] The demand requirement "is a substantive

*Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled on other grounds Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)).

[172] *Id.*

[173] *Id.* (quoting *United Food & Commercial Workers Union v. Zuckerberg*, 250 A.3d 862, 876 (Del. Ch. 2020), *aff'd sub nom. Zuckerberg*, 2021 WL 4344361).

[174] *Id.* (quoting *Aronson*, 473 A.2d at 811).

[175] *Id.* (quoting *Lenois v. Lawal*, 2017 WL 5289611, at *9 (Del. Ch. Nov. 7, 2017)).

requirement that '[e]nsure[s] that a stockholder exhausts his intracorporate remedies,' 'provide[s] a safeguard against strike suits,' and 'assure[s] that the stockholder affords the corporation the opportunity to address an alleged wrong without litigation and to control any litigation which does occur.'"[176]

Under Court of Chancery Rule 23.1, a shareholder seeking to assert a derivative claim must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[177] "Rule 23.1 is not satisfied by conclusory statements or mere notice pleading. On the other hand, the pleader is not required to plead evidence. What the pleader must set forth are particularized factual statements that are essential to the claim."[178] "When considering a motion to dismiss a complaint for failing to comply with Rule 23.1, the Court does not weigh the evidence, must accept as true all of the complaint's particularized and well-pleaded allegations, and must draw all reasonable inferences in the plaintiff's favor."[179]

---

[176] *Id.* (quoting *Lenois*, 2017 WL 5289611, at *9).
[177] Ct. Ch. R. 23.1.
[178] *Brehm*, 746 A.2d at 254.
[179] *Zuckerberg*, 2021 WL 4344361, at *7.

# III. ANALYSIS

The Plaintiffs did not make a demand on the Company's Board to institute this action.[180] Therefore, to survive a motion to dismiss, the Plaintiffs must plead with particularity that demand would be futile. That inquiry is satisfied if, given the truth of the particularized facts alleged and the reasonable inferences therefrom, the complaint creates a reasonable doubt that a majority of the Board is able to "bring [its] business judgment to bear" on behalf of the Company to assess the substance of the demand.[181] To determine whether demand would be futile, this Court asks the following three questions on a director-by-director basis:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[182]

---

[180] Compl. ¶ 259.
[181] *Ryan v. Armstrong*, 2017 WL 2062902, at *2 (Del. Ch. May 15, 2017), *aff'd*, 176 A.3d 1274 (Del. 2017).
[182] *Zuckerberg*, 2021 WL 4344361, at *17.

If the court determines that, for at least half of the members of the demand board, the answer to any of these questions is, "yes," then demand is excused as futile.[183]

The Plaintiffs here do not attempt to meet the requirements of (i) or (iii) above.[184] Instead, the Plaintiffs contend that seven of the nine Chemours's directors who have been on the Board since the Spin-Off face a substantial likelihood of liability for the alleged statutory violations and breaches of fiduciary duty relating to the stock repurchases, dividend payments, and stock sales.[185]

Chemours's certificate of incorporation contains an exculpatory provision, as authorized by 8 *Del. C.* § 102(b)(7), which provides as follows:

> To the fullest extent permitted by the DGCL, as it now exists and as it may hereafter be amended, no director of the Corporation shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of a fiduciary duty as a director, except for liability of a director (a) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (c) *under Section 174 of the DGCL*, or (d) for any transaction from which the director derived an improper personal benefit . . . .[186]

Therefore, the Plaintiffs must plead with particularity that a majority of the demand Board faces a substantial likelihood of liability for a non-exculpated claim.

---

[183] *Id.*
[184] *See* Compl. § V.
[185] *See id.*
[186] Friedlander Decl., Ex. 2 § 7.01 (emphasis added).

For the reasons below, I find that the Plaintiffs have failed to establish that a majority of Chemours's directors face a substantial likelihood of liability with respect to any of the Plaintiffs' claims.

### A. Demand Is Not Excused as to the Plaintiffs' Statutory Claims (Counts I and II)

Counts I and II of the Complaint seek to hold the Director Defendants liable under 8 *Del. C.* § 174 for the stock repurchases and dividend payments. Claims under Section 174 are not exculpated under the exculpatory provision in Chemours's certificate of incorporation.[187]

Section 174 provides that "[i]n case of any wilful or negligent violation of § 160 or § 173 of this title, the directors under whose administration the same may happen shall be jointly and severally liable . . . to the corporation, and to its creditors in the event of its dissolution or insolvency, to the full amount of the dividend unlawfully paid, or to the full amount unlawfully paid for the purchase or redemption of the corporation's stock . . . ."[188] In other words, in the event of a willful or negligent violation by the entity of Section 160 or Section 173 (which set out the requirements for a corporation to repurchase stock and pay dividends), Section 174 by its explicit terms imposes liability upon the directors in place at the time of the

---

[187] *See id.* Nor is exculpation for such a claim permitted by Delaware law. *See* 8 *Del. C.* § 102(b)(7)(iii).

[188] 8 *Del. C.* § 174(a).

violation, in the amount so distributed, running to the corporation and, if applicable, its creditors.[189] This rigorous liability scheme is tempered by Section 172 of the DGCL, however.[190] In the event of a violation, directors are "fully protected" under Section 172 from liability if they rely "in good faith" upon the corporation's records, officers and employees, committees of the board, or experts, in determining that the corporation has adequate funds to repurchase stock or pay dividends.[191] In other words, as I read the statute,[192] directors generally remain liable for a violation of Sections 160 or 173 arising from their own negligence or bad faith.

---

[189] *Id.* Section 174 further provides that even directors who were "absent when the same was done" may be liable unless they "caus[e] [their] dissent to be entered on the books containing the minutes of the proceedings of the directors at the time the same was done, or immediately after such director[s] ha[ve] notice of the same." *Id.*

[190] 8 *Del. C.* § 172.

[191] *Id.*

[192] At oral argument, the Plaintiff's counsel aptly referred to this action and its underlying theory as *sui generis*. *See* Oral Argument on Defs.' Mot. to Dismiss, Dkt. No. 59, at 90:7. So far as I am aware, this is the first time a court had occasion to consider an attempt by a stockholder to impose liability on the corporate behalf against directors for a violation of Sections 160 or 173, as vindicated by Section 174. *See, e.g.*, *JPMorgan Chase Bank, N.A. v. Ballard*, 213 A.3d 1211, 1216 (Del. Ch.) (Section 174 claim brought by creditor); *Quadrant Structured Prod. Co. v. Vertin*, 102 A.3d 155, 201 (Del. Ch. 2014) (Section 174 claim brought by noteholder); *In re Verizon Ins. Coverage Appeals*, 222 A.3d 566, 576 (Del. 2019) (Section 174 claim brought by trustee); *Johnston v. Wolfe*, 1983 WL 21437, at *2 (Del. Ch. Feb. 24, 1983) (Section 174 claim brought by purported creditors), *aff'd sub nom. Johnston v. Wolf*, 487 A.2d 1132 (Del. 1985); *In re Sheffield Steel Corp.*, 320 B.R. 405, 410 (Bankr. N.D. Okla. 2004) (Section 174 claim brought by corporation as debtor-in-possession in bankruptcy adversary proceeding); *In re Magnesium Corp. of Am.*, 399 B.R. 722, 776–77 (Bankr. S.D.N.Y. 2009) (Section 174 claim brought by Chapter 7 bankruptcy trustee); *In re Tribune Co. Fraudulent Conv. Litig.*, 2018 WL 6329139, at *11–12 (S.D.N.Y. Nov. 30, 2018) (Section 174 action brought by litigation trustee on behalf of creditors), *aff'd*, 10 F.4th 147 (2d Cir. 2021); *Fotta v. Morgan*, 2016 WL 775032, at *4 (Del. Ch. Feb. 29, 2016) (derivative claim sought "declaratory judgment that the stock issued as the dividend is void *ab initio*," not director liability under Section 174). Although a derivative Section 174 action was brought in *Feldman v. Cutaia*, the claim was extinguished by a merger under the continuous ownership rule, and thus the Court did not reach the merits. 956 A.2d 644, 651, 660–63 (Del. Ch. 2007), *aff'd*, 951 A.2d 727 (Del. 2008).

Sections 160 and 173, in turn, impose limits on a corporation's ability to repurchase stock and issue dividends, respectively. As relevant to this action, Section 160 provides that "no corporation shall . . . [p]urchase or redeem its own shares of capital stock for cash or other property when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation."[193] "A repurchase impairs capital if the funds used in the repurchase exceed the amount of the corporation's 'surplus.'"[194]

Section 173, through Section 170, provides for a similar requirement with respect to dividends, albeit with more wiggle room. Specifically, Section 173 states that "[n]o corporation shall pay dividends except in accordance with this chapter."[195] Section 170 states that "[t]he directors of every corporation . . . may declare and pay dividends upon the shares of its capital stock either: (1) Out of its surplus . . . ; or (2) In case there shall be no such surplus, out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year."[196]

In short, Sections 160, 170 and 173 preclude a corporation from issuing dividends or repurchasing stock in an amount that exceeds "surplus," except that dividends may also be issued from the corporation's net profits of the fiscal year in

---

[193] 8 *Del. C.* § 160(a)(1).
[194] *Klang*, 702 A.2d at 153.
[195] 8 *Del. C.* § 173.
[196] 8 *Del. C.* § 170(a)(1)–(2).

39

which the dividend is declared or the preceding fiscal year. "Surplus" is "defined by 8 *Del. C.* § 154 to mean the excess of net assets over the par value of the corporation's issued stock."[197] Because Chemours's issued stock has a nominal par value of $0.01 per share, the surplus calculations at issue here effectively boil down to a calculation of Chemours's net assets.[198] Net assets is defined by 8 *Del. C.* § 154 to mean "the amount by which total assets exceed total liabilities."[199]

The Plaintiffs contend that, because of the potential environmental liabilities, Chemours's net liabilities exceeded its net assets, such that the stock repurchases and dividend payments violated Sections 160, 170, and 173.[200] The Plaintiffs further contend that the Director Defendants themselves were at least negligent by relying on GAAP-based accounting reserves to calculate surplus, which the Plaintiffs argue exclude contingent environmental liabilities.[201]

As explained below, I find that the Complaint does not allege with particularity that the stock repurchases and dividend payments violated Sections 160, 170 or 173, or that the Director Defendants were negligent under Section 174.

---

[197] *Klang*, 702 A.2d at 153.
[198] *See* Pls.' Answering Br. at 37 ("Thus, if the fair value of a company's liabilities . . . exceed the fair value of its assets, its capital is statutorily impaired."); Defs.' Opening Br. at 28 n. 10 ("Like many companies, the par value of Chemours's stock is set at the nominal amount of $0.01 per share.").
[199] 8 *Del. C.* § 154.
[200] Pls.' Answering Br. at 37–38.
[201] *Id.* at 48–52.

I also find that the Director Defendants are "fully protected" from liability under Section 172.

### 1. The Complaint Concedes that Most of the Dividend Payments Complied with Delaware Law

As an initial matter, the Director Defendants do not face a substantial likelihood of liability with respect to the dividends paid in 2015, 2017, 2018, 2019 or 2020, and $7,000,000 of the dividends paid in 2016, because the Complaint concedes that those dividends complied with 8 *Del. C.* § 170. Specifically, Section 170 provides that, "[i]n case there shall be no such surplus" from which to declare dividends, "[t]he directors of every corporation . . . may declare and pay dividends . . . out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year."[202]

The Complaint concedes that Chemours's net profits exceeded its dividend payments in the 2017, 2018 and 2020 fiscal years.[203] The Complaint further concedes that Chemours had sufficient net profits in 2014 and 2018 from which to pay its 2015 and 2019 dividend payments.[204] Thus, for the fiscal years 2015, 2017, 2018, 2019, and 2020, the Company complied with Section 170 by paying "out of its net profits for the fiscal year in which the dividend is declared and/or the

---

[202] 8 *Del. C.* § 170(a)(2).
[203] Compl. ¶ 243.
[204] *Id.* ¶ 243.

41

preceding fiscal year."[205] The Plaintiffs do not appear to dispute this point, and contends only that the "Defendants recognize, as they must, that there were other points in time that the Company lacked sufficient net profits to pay dividends."[206] Accordingly, because the Complaint does not allege a violation of Section 170 in connection with the 2015, 2017, 2018, 2019 or 2020 dividend payments, the Director Defendants do not face a substantial likelihood of liability, and demand is not excused, with respect to those dividends.

With respect to the dividends issued in the 2016 fiscal year, the Complaint alleges that Chemours issued $16,345,494 in dividends, but recorded only $7,000,000 in net profits, with negative net profits in the preceding year.[207] In other words, the Complaint concedes that at least $7,000,000 of the dividend payments from the 2016 fiscal year complied with Section 170, because they were paid out of net profits. Accordingly, with respect to that portion of the 2016 dividend payments, the Director Defendants do not face a substantial likelihood of liability, and demand is not excused.

---

[205] 8 *Del. C.* § 170. *See also* Defs.' Opening Br. at 29 n.9 ("[T]he Complaint's own allegations dictate that the Company's net profits defeat liability for all of the Company's dividends in 2015, 2017, 2018, 2019, and 2020.").

[206] *See* Pls.' Answering Br. at 38 n.7.

[207] Compl. ¶ 243.

## 2. The Complaint Does Not Plead that The Board's Surplus Determinations Violated Delaware Law

The Plaintiffs' remaining statutory claims concern the 2017 and 2018 Stock Repurchase Programs and the $9,345,494 in dividends issued in 2016 that exceeded Chemours's net profits in that year and the preceding year. The Plaintiffs contend that these capital returns violated Sections 160 and 170 because the Company allegedly did not have "surplus" from which to issue dividends or repurchase stock.[208]

The parties disagree on the standard of review that the Court should apply to a Board's surplus determination. The Plaintiffs contend that, under Section 174, the standard is simple negligence.[209] The Defendants, in contrast, argue that the Section 174 negligence standard is only implicated "if, in fact, a board failed to calculate surplus appropriately."[210] The Defendants further argue that "bad faith or fraud," not negligence, is the standard to show an improper surplus calculation.[211]

Both the Plaintiffs and the Defendants rely largely on the same case to support their arguments: *Klang v. Smith's Food & Drug Centers, Inc.*[212] In *Klang*, this Court declined to rescind a stock repurchase, finding that the board's surplus calculation

---

[208] Pls.' Answering Br. at 37–38.
[209] *See id.* at 43 ("The DGCL's negligence standard firmly applies.").
[210] *See* Defs.' Opening Br. at 29.
[211] *See id.* at 29 (citing *Klang*, 702 A.2d at 156).
[212] 702 A.2d 150. *See also Klang v. Smith's Food & Drug Centers, Inc.*, 1997 WL 257463 (Del. Ch. May 13, 1997), *aff'd*, 702 A.2d 150.

43

did not violate Section 160.[213]  The Defendants argue that, under *Klang*, this Court should defer to the Board's surplus calculation "unless [the Plaintiffs] can show that the directors 'failed to fulfill their duty to evaluate the assets on the basis of acceptable data and by standards which they are entitled to believe reasonably reflect present values.'"[214]  Thus, the Defendants argue that *Klang* requires the Plaintiffs to plead particularized facts showing "bad faith or fraud on the part of the board," or "actual or constructive fraud."[215]

The Plaintiffs take a contrary view.  The Plaintiffs argue that *Klang* does not mandate a "bad faith or fraud" standard, but rather, it says that the Board's surplus determination can only be given "reasonable latitude" if the Board (i) "evaluate[s] assets and liabilities in good faith," (ii) "on the basis of acceptable data," (iii) "by methods that they reasonably believe reflect present values," and (iv) "arrive[s] at a determination of the surplus that is not so far off the mark as to constitute actual or constructive fraud."[216]

---

[213] 1997 WL 257463, at *2–5.
[214] Defs.' Opening Br. at 29 (quoting *Klang*, 702 A.2d at 155–56).  The Defendants also cite to *SV Inv. Partners, LLC v. ThoughtWorks, Inc.*, for the same proposition.  7 A.3d 973, 988 (Del. Ch. 2010), *aff'd*, 37 A.3d 205 (Del. 2011).
[215] Defs.' Opening Br. at 30 (quoting *Klang*, 702 A.2d at 156).
[216] Pls.' Answering Br. at 39 (quoting *Klang*, 702 A.2d at 152).

Although *Klang* did not involve an action seeking to hold directors liable to the corporation for negligence under Section 174,[217] it does provide guidance as to how this Court should evaluate a Board's surplus determination under Sections 160 and 170. As a general proposition, the DGCL "contains no prescriptions as to the form or manner of preparing and maintaining books of account and financial statements nor of the manner in which the corporation values its assets for such purposes."[218] As a result, "[t]he determination of the amount that is to be 'capital' and the amount that is to be 'surplus' is one that essentially is within the control and discretion of the board of directors."[219]

Likely for this reason, the *Klang* Court observed that Section 154, which defines surplus, "does not require any particular method of calculating surplus, but simply prescribes factors that any such calculation must include."[220] Those factors are the corporation's "total assets" and "total liabilities."[221] Thus, as the *Klang* Court explained, "compliance with Section 160"—and, by extension, Section 170, which requires the same surplus determination—is satisfied "by methods that fully take

---

[217] In *Klang*, the plaintiff sought "rescission of a series of transactions including a . . . stock repurchase," on the basis that the corporation lacked surplus to repurchase stock. 1997 WL 257463, at *1. Thus, the Court had no reason to consider Section 174.
[218] Balotti and Finkelstein, The Delaware Law of Corporations and Business Organizations § 5.22 (4th ed., Dec. 2020 update).
[219] *Id. See also In re Color Tile, Inc.*, 2000 WL 152129, at *3 (D. Del. Feb. 9, 2000) (explaining in dicta that "[t]he directors . . . have almost unfettered discretion in defining the extent of the corporation's surplus").
[220] 702 A.2d at 155.
[221] 8 *Del. C.* § 154.

45

into account the assets and liabilities of the corporation."[222]  Therefore, under *Klang*, this Court will defer to the Board's surplus calculation "so long as [the directors] evaluate assets and liabilities in good faith, on the basis of acceptable data, by methods that they reasonably believe reflect present values, and arrive at a determination of the surplus that is not so far off the mark as to constitute actual or constructive fraud."[223]  The *Klang* Court's ruling—according deference to directors' "reasonable belief" as to corporate "present values"—is consistent with the Section 174 standard that directors are liable in case of their bad faith or negligent actions regarding surplus.  If the Complaint does not allege with particularity that the Board's surplus determinations fell short of the criteria outlined in *Klang*, the determinations comply with Sections 160, 170, and 173.  And if the Board's surplus determinations comply with those sections, there is no "willful or negligent" violation for which to hold the Director Defendants liable.

The Plaintiffs argue that the Board's alleged reliance on GAAP-based accounting reserves in connection with its surplus determinations was unreasonable under the circumstances known to the directors, in that it failed to "fully take into account the assets and liabilities of the corporation."[224]  Specifically, the Plaintiffs argue that because GAAP "does not require recognition of liabilities unless they are

---

[222] 702 A.2d at 155.
[223] *Id.*
[224] *See* Pls.' Answering Br. at 43 (quoting *Klang*, 702 A.2d at 155).

46

both 'probable' and 'reasonably estimable,'" any GAAP-based calculation may exclude the significant contingent environmental liabilities.[225] Thus, the Plaintiffs argue that the Director Defendants were required under *Klang* to revalue the Company's assets and liabilities to fully account for the contingent environmental liabilities.[226] According to the Plaintiffs, the inclusion of those contingent environmental liabilities—which the Plaintiffs say must not include any discount for the probability of success—would reveal that "such liabilities greatly exceed GAAP reserves."[227]

The Complaint does not allege particularized facts showing that by relying on GAAP-based accounting reserves, the Director Defendants failed to "fully take into account the assets and liabilities of the corporation."[228] Generally, "Delaware corporations . . . follow generally accepted accounting principles" (i.e., GAAP) when "preparing and maintaining books of account and financial statements" and "valu[ing] its assets for such purposes."[229] The Complaint does not allege with particularity why the Board was required to depart from this "generally accepted" approach here.

---

[225] *See id.* at 40–41.
[226] *See id.* at 42–43.
[227] *See id.* at 42.
[228] *See id.* at 43 (quoting *Klang*, 702 A.2d at 155).
[229] Balotti and Finkelstein, The Delaware Law of Corporations and Business Organizations § 5.22 (4th ed., Dec. 2020 update).

47

To begin, the Complaint does not allege particularized facts suggesting that, at the time the Board approved the 2017 and 2018 Stock Repurchases and the 2016 dividend payments, the contingent environmental liabilities were neither "probable" nor "reasonably estimable," such that they were in fact excluded from the GAAP accounting reserves. At most, the Plaintiffs allege that the *DuPont* Complaint admitted that, "as of December 31, 2014," GAAP accounting reserves excluded liabilities that were not "viewed as 'probable'" and "also excluded liabilities that were regarded as probable at the time, but for which DuPont had not yet made an estimate."[230]

But this admission says nothing about whether the contingent environmental liabilities remained improbable and not yet estimated at the time the Board approved the 2017 and 2018 Stock Repurchase Programs, years later, on November 30, 2017, August 1, 2018, and February 13, 2019,[231] or when the Board approved the 2016 dividend payments between April 2016 and November 2016.[232] Indeed, the Complaint includes pages of allegations detailing the developments in the environmental litigation after December 31, 2014, including the settlement of the Ohio MDL in February 2017 and the bellwether cases that DuPont lost in mid-

---

[230] Compl. ¶ 70.
[231] *See id.* ¶¶ 229–30.
[232] *See id.* ¶ 241.

2016.[233] Without more, it is not reasonable to infer that, for years after December 31, 2014, the contingent environmental liabilities continued to be unrecognized under the accounting methods used by Chemours.

Nor does the Complaint plead with particularity that, even if the GAAP-based accounting reserves excluded the contingent environmental liabilities as improbable and not reasonably estimable, their inclusion would have rendered Chemours without surplus. To arrive at their conclusion that the contingent environmental liabilities rendered Chemours insolvent, the Plaintiffs compile a list of figures asserted by Chemours in the *DuPont* Complaint, which the Plaintiffs label "Company Conservative Estimate[s]," that add up to $2.56 billion.[234] The Plaintiffs argue that, by asserting these figures in the *DuPont* Complaint, the Company "admitted" that it was responsible for these liabilities.[235] The Plaintiffs then contend that the Board was precluded from discounting those supposed estimates to their "present value" in connection with their surplus determination.[236]

These arguments fail for several reasons. First, most of the figures from the *DuPont* Complaint that the Plaintiffs rely on to arrive at their $2.56 billion calculation do not actually represent the Company's "conservative estimates" of

---

[233] *See e.g.*, *id.* ¶¶ 95–100, 104–18.
[234] *See id.* ¶ 222.
[235] *Id.*
[236] *See* Pls.' Answering Br. at 42–43.

Chemours's contingent environmental liabilities. For instance, the Complaint attributes a $335 million figure to the Ohio MDL,[237] which appears to be derived from the $670 million settlement that was "split evenly between DuPont and Chemours."[238] But as the Complaint admits, that settlement occurred in February 2017—before the Board approved the 2017 and 2018 Stock Repurchase Programs.[239] The $335 million figure thus was not "contingent" at the time the Board approved the stock repurchases (let alone "improbable" or "not estimated" such that it would be excluded from GAAP).

Likewise, the Plaintiffs claim that the *DuPont* Complaint admitted $194 million in PFAS liabilities.[240] But the *DuPont* Complaint actually alleged that the $194 million figure was a "catch-all" Maximum that "included everything from PFAS liability to commercial litigation."[241] And the figures that the Plaintiffs say the *DuPont* Complaint ascribed to the four New Jersey sites, the Chambers Works site, and benzene liability are actually estimates made by DuPont or demands from the claimants themselves, *not* estimates made by Chemours.[242] Indeed, the only

---

[237] Compl. ¶ 222.
[238] *Id.* ¶ 98.
[239] *Id.*
[240] *Id.* ¶ 222.
[241] *DuPont* Complaint ¶ 8. *See also id.* ¶ 110 ("[DuPont] certified a catch-all [Maximum] of $194 million for all other 'General Litigation . . . to Perpetuity,' which Houlihan Lokey reflected as including everything not separately valued—from PFAS liability to commercial litigation.").
[242] *See id.* ¶ 106 ("[A] New Jersey municipality has brought suit against DuPont seeking over $1 billion to address alleged clean-up costs" for Chambers Works.); *id.* ¶¶ 8, 108 ("[I]n 2018, [DuPont] provided Chemours with a more comprehensive study valuing the potential maximum

figure the Plaintiffs cite that actually appears to be an estimate by Chemours was the $200 million for remediation of Fayetteville Works,[243] as the *DuPont* Complaint alleged that "the cost to Chemours of implementing the consent order will be more than $200 million."[244]   Again, there is no indication that this amount was excluded under GAAP accounting at the time the stock repurchase and dividend decisions were made.

Significantly, moreover, the *DuPont* Complaint did not "admit," as the Plaintiffs contend, that Chemours was on the hook for any of these purported liability estimates.  Instead, the *DuPont* Complaint alleged that "*if* Chemours had unlimited responsibility for the true potential maximum liabilities, it *would have been* insolvent as of the time of the spin-off."[245]  In other words, the *DuPont* Complaint was simply seeking to enforce DuPont's putative liability for amounts that exceeded the Maximums DuPont certified in the Spin-Off; it was not admitting Chemours's liability for those amounts.  The statements made by Chemours's counsel at the December 18, 2019 oral argument are not to the contrary.  There, Chemours's counsel reiterated that Chemours would have been insolvent at the time of the Spin-Off *if* it was responsible for amounts beyond the Maximums:  "*provided* that

---

costs at over $111 million" for benzene.); *id.* ¶ 101 ("In 2018, in connection with the DowDuPont spin-off, DuPont revised its liability estimate upward to approximately $620 million" for New Jersey liabilities.).

[243] Compl. ¶ 222.

[244] *DuPont* Complaint ¶ 6.

[245] *See* Compl. ¶ 219.

DuPont's present interpretation of the complete inutility of its estimated maximum liabilities *is credited*," "Chemours was insolvent at the time of the [Spin-Off]."[246]

Furthermore, the Plaintiffs are incorrect as a matter of law that "contingent liabilities should not be discounted to present value."[247] In support of this argument, the Plaintiffs invoke *Boesky v. CX Partners, L.P.*, a case involving the liquidation of a Delaware limited partnership.[248] *Boesky* is not controlling, because it did not involve a surplus determination under Sections 160 and 170, nor did it involve a dividend, a stock repurchase, or even a corporation.[249] But it also does not support the Plaintiffs' position. In *Boesky*, this Court declined to defer to the business judgment of a liquidating trustee's determination that the partnership had adequate liability reserves before making partnership distributions.[250] In dicta, the Court discussed whether, in that context, it was appropriate to discount contingent claims, noting that "discount[ing] the claim by a probability of its success and . . . reserv[ing] only the discounted value might work" with "a sufficiently large number of similar claims so that statistical techniques might apply," but "[w]here . . . there are few claims or each is quite different, such a technique obviously raises a danger . . ." to residual claimants who would otherwise lack recourse.[251] The Court ultimately

---

[246] *See DuPont* Oral Argument Tr. at 149:3–150:1 (emphasis added).
[247] Pls.' Answering Br. at 42.
[248] 1988 WL 42250, at *1 (Del. Ch. Apr. 28, 1988).
[249] *Id.*
[250] *Id.* at *16.
[251] *Id.*

declined to "address the question whether discounting is appropriate."[252] The Plaintiffs cite no other support for the proposition that contingent claims cannot be discounted. To the contrary, under *Klang*, Sections 160 and 170 only require a valuation that "'reasonably reflect[s] present values.'"[253] Such a valuation would necessarily include a probability component.

Finally, even if the Complaint did adequately plead that the Company lacked surplus, the Complaint does not allege with particularity that a majority of the demand Board did not "reasonably believe" in good faith that the GAAP-based accounting reserves "reflect present values."[254] The Plaintiffs argue that the Director Defendants were "inundated with information that the Company's liabilities would take it to—or beyond—the precipice of solvency," such that the Director Defendants were negligent in their reliance on GAAP.[255] Namely, the Plaintiffs contend that two of the Director Defendants, Brown and Crawford, who were former DuPont directors, "knew that DuPont wanted to shed its Performance Chemicals division in order to rid itself of massive environmental liabilities," and that a third Director Defendant, Vergnano, "ran the Performance Chemicals division for years prior to the Spin-Off and was intimately involved in the business."[256] The Plaintiffs also

---

[252] *Id.* at *17.
[253] 702 A.2d at 155 (quoting *Morris v. Standard Gas & Elec. Co.*, 63 A.2d 577, 582 (1949)).
[254] *Id.*
[255] *See* Pls.' Answering Br. at 40–41.
[256] *See id.* at 40.

53

note that the Director Defendants "received regular, quarterly updates on actual and potential environmental litigation," and received an "Enterprise Risk Management" presentation stating that "Legacy/Future Environmental-Operational Sustainability" was the Company's number one risk.[257]  Finally, the Plaintiffs note that, following the Spin-Off, the Director Defendants sought individual indemnification agreements related to their Chemours Board service.[258]  Per the Plaintiffs, the latter fact demonstrates a fear of liability engendered by the directors' knowledge of Chemours's insolvency.[259]  Based on these allegations, the Plaintiffs argue that it was "unreasonable" for the Director Defendants to rely on GAAP metrics.

Even under the negligence standard that the Plaintiffs urge, that is not enough to establish that a majority of the demand Board faces a substantial likelihood of liability.  At most, the Plaintiffs have alleged that three of the nine members of the demand Board—Directors Brown, Crawford and Vergnano—had knowledge of the environmental liabilities from their time at DuPont prior to the Spin-Off, and that the Director Defendants were aware of and regularly received updates on the environmental liabilities.  It is not reasonable to infer, based on those allegations, that a majority of the Director Defendants "knew or should have known" that GAAP

---

[257] *See id.* at 40–41, 50.
[258] *See id.* at 40.  The Plaintiffs also note that Defendant Newman "refused to certify the accuracy of the [Maximums] in connection with the Spin-Off."  *Id.*  Defendant Newman is not, however, a Director Defendant, nor is he a member of the demand Board.
[259] *See id.*

understated those liabilities, such that their reliance on GAAP was unreasonable. Nor does the fact that the Director Defendants approved indemnification agreements related to their Board service support a reasonable inference of negligence or bad faith. Director indemnification exists "to encourage capable [people] to serve as corporate directors, secure in the knowledge that expenses incurred by them in upholding their honesty and integrity as directors will be borne by the corporation they serve."[260] The Plaintiffs' bare conclusion that the Director Defendants sought indemnification agreements "out of fear that Chemours was insolvent"[261] is speculation that is not supported by any particularized allegations.

At bottom, the Complaint alleges no particularized facts undermining the Board's reliance on GAAP-based accounting reserves in connection with its determinations that the stock repurchases and dividend payments complied with the DGCL. The Director Defendants therefore do not face a substantial likelihood of liability under Section 174 for violations of Section 160, 170 or 173.

### 3. The Director Defendants are "Fully Protected" Under Section 172

Beyond the Complaint's failure to allege a violation of Sections 160, 170, 173, or 174, the Director Defendants also do not face a substantial likelihood of liability

---

[260] *Stifel Fin. Corp. v. Cochran*, 809 A.2d 555, 561 (Del. 2002).
[261] *See* Pls.' Answering Br. at 40.

because they are "fully protected" under 8 *Del. C.* § 172. Section 172 provides as

follows:

> A member of the board of directors . . . shall be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of its officers or employees, or committees of the board of directors, or by any other person as to matters the director reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation, as to the value and amount of the assets, liabilities and/or net profits of the corporation or any other facts pertinent to the existence and amount of surplus or other funds from which dividends might properly be declared and paid, or with which the corporation's stock might properly be purchased or redeemed.[262]

The Plaintiffs argue that Section 172 is an affirmative defense that cannot be

considered at the pleading stage. In support of this argument, the Plaintiffs cite

*Manzo v. Rite Aid Corp.*, in which this Court declined to apply the defense of good

faith reliance on the reports of corporate advisors and officers under

8 *Del. C.* § 141(e) at the pleading stage.[263] But in *Manzo*, "the complaint d[id] not

---

[262] 8 *Del. C.* § 172.

[263] 2002 WL 31926606, at *3 n.7 (Del. Ch. Dec. 19, 2002), *aff'd*, 825 A.2d 239 (Del. 2003). Although *Manzo* concerned 8 *Del. C.* § 141(e), not Section 172, the statutes are nearly identical. *See* 8 Del. C. § 141(e) ("A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation."). *See also Klang*, 702 A.2d at 156 n.12 (comparing Section 172 and Section 141(e)).

include allegations regarding the reports of experts."[264]  In contrast, in *Brehm v. Eisner*, the Supreme Court of Delaware applied the good faith reliance defense under 8 *Del. C.* § 141(e) at the pleading stage where "[t]he [c]omplaint . . . admit[ed] that the directors were advised by . . . an expert and that they relied on his expertise."[265]  Accordingly, Section 172, like Section 141(e), is available as a pleading-stage defense if it is clear from the allegations of the Complaint and the documents incorporated by reference therein.[266]

The Plaintiffs argue that the Complaint does not demonstrate that the Director Defendants ever reviewed or were advised as to the Company's "capital" or "surplus."[267]  The Complaint admits, however, that the Board concluded, at every meeting at which it declared a dividend or approved the stock repurchase programs, that the capital returns complied with Delaware law.[268]  The Complaint further admits that the Board was advised that "return of capital strategies should be evaluated in light of liquidity and credit agreement constraints from any potential settlement of contingent liabilities,"[269] and that the Board and Audit Committee discussed the legal and environmental reserves and received regular presentations

---

[264] 2002 WL 31926606, at *3 n.7.
[265] *Brehm*, 746 A.2d at 261.
[266] *See id. Cf. Malpiede v. Townson*, 780 A.2d 1075, 1094 (Del. 2001) (applying Section 102(b)(7) defense at pleading stage).
[267] Pls.' Answering Br. at 44.
[268] *See* Compl. ¶¶ 126, 146, 162, 171, 178, 191, 203.
[269] *Id.* ¶ 129.

from management on the environmental liabilities, including during the meetings at which the Board declared dividends and approved the repurchase programs.[270] Finally, the Complaint admits that the first time the Board met to discuss dividends, it received a presentation from its financial advisor detailing the statutory requirements under Delaware law, and that the Board received presentations from two different financial advisors before it proceeded with the stock repurchases.[271] In short, the Complaint itself establishes that the Board considered whether the capital returns complied with Delaware law, that it did so after consulting with the Company's management and financial advisors, and that it did so after receiving presentations on the environmental liabilities.

The Plaintiffs next argue that, even to the extent the Director Defendants were advised that the stock repurchases and dividend payments complied with Delaware law, the Board merely "blindly rel[ied] on reports by the Company's officers or advisors that omit[ted] the consideration and analysis of known, material risks," and that the Board should have instead "ask[ed] for a quantification of 'capital' and 'surplus,' in light of the growing environmental liabilities."[272] But the Court in

---

[270] *Id.* ¶¶ 132, 138–41, 144–47, 153–54, 156, 160–62, 164–71, 174–78, 180, 187–91, 201–04.
[271] *See id.* ¶¶ 126, 141.
[272] Pls.' Answering Br. at 44.

58

*Klang* held that this sort of "facts and figures balancing of assets and liabilities" is not required in a surplus determination.[273]

The Plaintiffs cite two cases in support of their argument that the Board was "duty bound" to second guess the GAAP-based legal and environmental reserves provided by the Company's management in calculating surplus. I find neither cogent. In *Smith v. Van Gorkom*, the board of directors approved a company sale at a "hastily call[ed] . . . meeting without prior notice of its subject matter," "without any prior consideration of the issue or necessity therefor," during which the directors "had before [them] nothing more than [a conflicted executive's] statement of his understanding of the substance of an agreement which he admittedly had never read, nor which any member of the Board had ever seen."[274] And in *Cornell v. Seddinger*, a Pennsylvania case from 1912, the directors relied on a "method of accounting [that] was entirely wrong," and the "minutes show[ed] that . . . there was a shortage of working capital, and the directors were considering the necessity of borrowing money, both upon notes and by mortgaging the real estate."[275] In contrast, as discussed above, the Board here received regular updates on the environmental litigation and the Company's legal and environmental reserves, which were

---

[273] *Klang*, 702 A.2d at 155.
[274] 488 A.2d 858, 874–75 (Del. 1985), *overruled on other grounds Gantler v. Stephens*, 965 A.2d 695 (Del. 2009).
[275] 85 A. 446, 448 (1912).

calculated in accordance with "generally accepted accounting principles," including during the meetings at which the dividends and stock repurchases were approved.

In sum, the Complaint establishes that the Director Defendants are "fully protected" by Section 172 because they relied "in good faith upon the records of the [Company] and upon" the Company's officers and financial advisors.[276] For this reason, and because, as discussed above, the Complaint does not plead a "willful or negligent" violation of Sections 160, 170, 173, the Director Defendants do not face a substantial likelihood of liability with respect to Counts I and II.

### B. Demand Is Not Excused as to the Plaintiffs' Breach of Fiduciary Duty Claim (Count III)

In the alternative, the Complaint brings a claim for breach of fiduciary duty in connection with the stock repurchases and dividend payments. Specifically, the Complaint alleges that, "even if Chemours did not lack sufficient 'capital,' 'surplus,' and/or 'net profits' at the time of each of the stock repurchases and the dividends," the Director Defendants breached their fiduciary duties by authorizing the capital returns "when they knew that the Company faced a serious risk of insolvency."[277]

The Company's certificate of incorporation exculpates members of the Board for breaches of fiduciary duty except bad faith.[278] Accordingly, to prevail on their

---

[276] *See* 8 *Del. C.* § 172.
[277] Compl. ¶ 30. *See also id.* ¶¶ 273–76.
[278] Friedlander Decl., Ex. 2 § 7.01.

breach of fiduciary duty claim, the Plaintiffs must allege particularized facts establishing that the Director Defendants face a substantial likelihood of liability for bad faith in connection with the stock repurchases and dividends.

To state a bad faith claim, the Plaintiffs must allege particularized facts that the Director Defendants "demonstrate[d] a conscious disregard for [their] duties" by approving the stock repurchases and dividend payments.[279] The Plaintiffs do not attempt to meet this standard, and instead contend only that the Board's "monitoring of the Company's environmental liability exposure" and "reliance on advisors" was not "reasonable."[280] But reasonableness is not the standard for bad faith.[281] Moreover, as discussed above, the Complaint does not plead with particularity that the Company was ever insolvent.[282] Accordingly, the Director Defendants do not face a substantial likelihood of liability, and demand is not excused, with respect to Count III.

---

[279] *In re Alloy, Inc.*, 2011 WL 4863716, at *7 (Del. Ch. Oct. 13, 2011).
[280] Pls.' Answering Br. at 53.
[281] *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 125 (Del. Ch. 2009) ("[W]hen a plaintiff seeks to show that demand is excused because directors face a substantial likelihood of liability where 'directors are exculpated from liability except for claims based on 'fraudulent,' 'illegal' or 'bad faith' conduct, a plaintiff must also plead particularized facts that demonstrate that the directors acted with scienter, i.e., that they had 'actual or constructive knowledge' that their conduct was legally improper.'") (quoting *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008)).
[282] *See supra* § III.A.2.

*C. Demand Is Not Excused as to the Plaintiffs' Claims Against the Officer Defendants (Counts IV–VII)*

Finally, demand is not excused with respect to Counts IV–VII, which are brought only against the Officer Defendants. Counts VI–V seek to hold the Officer Defendants liable for their stock sales made while allegedly aware that Chemours was insolvent.[283] Counts VI–VII seek to hold the Officer Defendants liable, in the alternative, for allegedly failing to "share . . . information with the Board" regarding the "size, scope, and scale of Chemours's inherited liabilities."[284] The Plaintiffs' only articulated basis for demand futility for these claims is that "a majority of the demand Board faces a substantial likelihood of liability."[285]

As the Plaintiffs concede, Counts IV–VII are brought against only one member of the demand Board, Defendant Vergnano.[286] The Plaintiffs contend, however, that "this Court . . . has excused pre-suit demand for claims even when such claims were not brought against a majority of the corporation's current directors."[287] In particular, the Plaintiffs argue that "'where a member of the demand board's interest extends beyond derivative claims asserted against him to claims

---

[283] Compl. ¶¶ 277–86.
[284] *Id.* ¶¶ 287–300.
[285] *Id.* ¶ 260–62.
[286] *See* Pls.' Answering Br. at 53.
[287] *See* Pls.' Answering Br. at 54 (citing *Hughes v. Xiaoming Hu*, 2020 WL 1987029, at *17–18 (Del. Ch. Apr. 27, 2020); *Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *26 (Del. Ch. Aug. 24, 2020); *In re CBS Corp. S'holder Class Action & Derivative Litig.*, 2021 WL 268779, at *47 (Del. Ch. Jan. 27, 2021), *as corrected* (Feb. 4, 2021)).

asserted against his co-defendants, he is deemed unfit to consider a demand to pursue those claims as well.'"[288] Therefore, the Plaintiffs contend that because a majority of the demand Board faces a substantial likelihood of liability as to Counts I–III, demand is excused as to Counts IV–VII, which purportedly "implicate the same set of facts" as Counts I–III.[289]

The problem with this argument, of course, is that I have held above that the Director Defendants do not face a substantial likelihood of liability with respect to Counts I–III.[290] Therefore, even to the extent that Counts VI–VII implicate the same set of facts as Counts I–III, they do not pose a substantial likelihood of liability to the demand Board, which accordingly, could deploy its business judgment to evaluate a demand. Demand is not excused.

## IV. CONCLUSION

For the foregoing reasons the Motion to Dismiss is GRANTED in its entirety. The parties should confer and submit a form of order consistent with this opinion.

---

[288] *See* Pls.' Answering Br. at 54 (quoting *CBS*, 2021 WL 268779, at *47).
[289] *See id.* at 54–55.
[290] *See supra* §§ III.A–B.